— FOR REPORTER PUBLICATION —

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 15-cv-21915-GAYLES

**ALBERTO T. FERNANDEZ, HENNY
CRISTOBOL, and PATRICIA RAMIREZ,**
               **Plaintiffs,**

      **v.**

**THE SCHOOL BOARD OF MIAMI-DADE
COUNTY, FLORIDA,**
                  **Defendant.**
_____/

### <u>ORDER</u>

In this First Amendment action, the Plaintiffs, Alberto T. Fernandez, Henny Cristobol, and

Patricia Ramirez, all current employees of the Miami-Dade County School District (the "District"),

allege that the Defendant, the School Board of Miami-Dade County (the "School Board"), un-

lawfully took adverse employment action against them in retaliation for their attempt to convert

Neva King Cooper Educational Center ("Neva King")—a school at which the Plaintiffs all formerly

held positions—from a public school to a charter school (an attempt that ultimately failed). Before

the Court is the School Board's Motion to Dismiss the Plaintiffs' Second Amended Complaint

[ECF No. 31]. The Court has carefully considered the pleadings, the operative Complaint, and the

applicable law. For the reasons that follow, the School Board's motion shall be denied.

## I.    BACKGROUND

### A.    *Factual Allegations*

#### 1.    Charter Conversion Attempt

According to the allegations in the Second Amended Complaint, in 2011, Plaintiff

Cristobol, the then–vice principal of Neva King, introduced the idea of charter school conversion

to its then-principal, Plaintiff Fernandez. Second Am. Compl. ¶¶ 8-9. Fernandez wanted to conduct

additional research before presenting the idea to the school's Educational Excellence School Advisory Committee ("EESAC"). He enlisted three Neva King employees to assist him in this research, one of whom was Plaintiff Ramirez, who was a Placement Specialist at Neva King at the time. *Id.* ¶¶ 7, 9. Fernandez recommended that the EESAC vote in favor of exploring charter status, which it voted unanimously to do on February 2, 2012. *Id.* ¶ 11.

When Fernandez called his supervisor (unnamed in the Complaint) immediately following the EESAC vote to inform him of the prospective conversion, his supervisor warned him that "repercussions would follow." *Id.* ¶ 12. The next day, and for every day thereafter until the Plaintiffs were ultimately removed from the school, a District administrator was dispatched to Neva King to "monitor activities at the school." *Id.* ¶ 13. "District administrators" then instructed Fernandez to call a staff meeting to discuss the conversion recommendation. *Id.* ¶ 14. The meeting was attended by approximately fifteen "high-level officials, including members of the Superintendent's Cabinet." *Id.* These officials gave Neva King staff members "misleading and one-sided information about the prospective conversion that was contrary to Florida law." *Id.* "School District officials" threw out several more hurdles; for example, Assistant Superintendent Milagros Fornell prohibited Fernandez from rescheduling the conversion vote after the District's Chief Budget Officer provided incomplete information to Fernandez regarding Neva King's revenues. *Id.* ¶¶ 16-17. Ultimately, "District Administrators" decided to terminate the conversion ballot procedure. *Id.* ¶¶ 18-19.

### 2. The District's Investigation of Fernandez and Cristobol

After the conversion attempt failed, the District informed Fernandez and Cristobol that they would be subject to an investigation by the District's Civilian Investigative Unit, led by investigator Terri Chester and her superior, Julio Miranda, for allegedly attempting to influence the outcome of the conversion vote, using District time and resources to facilitate the conversion, and arranging for an unauthorized individual to address school faculty and staff regarding the conversion. *Id.*

¶¶ 20-21. Fernandez and Cristobol were later informed that they were "prohibited" from speaking with complainants or witnesses during the course of the investigation. *Id.* ¶ 21. On April 26, 2012, Chester sent a letter to select Neva King employees informing them that she had been assigned the responsibility of investigating Fernandez and Cristobol for alleged violations of School Board policies and instructing them that they were "not to contact any subject(s) or witnesses, with the intent to interfere with the investigation." *Id.* ¶ 22.

During the investigation, Chester interviewed Ava Goldman, the Administrative Director, Fernandez and Cristobol's supervisor, and the most frequent District administrator sent to monitor activities at Neva King. *Id.* ¶ 23. In that interview, Goldman stated that Fernandez and Cristobol "were not authorized to utilize District time and resources to research, plan, and direct staff to present and ask for a vote to convert" Neva King into a charter school. *Id.* Further, she stated that Fernandez and Cristobol were instructed not to use District time and resources to conduct those activities. *Id.*

On June 22, 2012, the investigation concluded with a finding of probable cause that Fernandez and Cristobol violated several School Board policies: Standards of Ethical Conduct, Code of Ethics, Staff Network and Internet Acceptable Use and Safety, and Staff Electronic Mail. *Id.* ¶ 25. The case was forwarded to the Office of Professional Standards, which issued a finding of probable cause. *Id.* ¶ 26. A Conference for the Record was held to address Fernandez and Cristobol's alleged violations of School Board policies; the conference's summary stated that "converting Neva King Cooper Educational Center into a charter conversion school was not a part of [their] official duties." *Id.* ¶ 27. District administrators told Fernandez and Cristobol that they were to "adhere to the Terms and Conditions of the Administrative placement which was issued to [them] on May 2, 2012," which included what later was termed as a "gag order," directing them to "refrain from contacting any parties involved in this investigation by any means at any time." *Id.* ¶ 28.

The School Board disposed of its disciplinary proceeding against Cristobol with the issuance of a written reprimand. *Id.* ¶ 34. The School Board removed Cristobol from alternate assignment status (discussed more fully *infra*, subection I.A.4), and continued his placement at South Dade Senior High School as assistant principal. *Id.* The School Board transferred Cristobol to an assistant principalship at TERRA Environmental Research Institute in June 2013. *Id.*

As for Fernandez, he was informed by letter in February 2013 that the School Board was rescinding his provisional reappointment and that a failure by Fernandez to request a meeting within fifteen days would result in the termination of his employment with the School Board effective March 8, 2013. *Id.* ¶ 35. The letter also informed him that his non-reappointment "precluded his future employment in any capacity by Miami-Dade County Public Schools." *Id.* Fernandez requested a meeting to contest this decision, and at that meeting, where his requests to have counsel and a court reporter present were denied, he was told that the School Board would "get back with" him regarding the possible termination of his employment. *Id.* ¶ 36. Not until the Florida Department of Education issued a notice to the Superintendent that there were reasonable grounds to suspect that Fernandez had been retaliated against did the School Board determine that it would not impose a written reprimand or any other formal discipline. *Id.* ¶ 37. On June 19, 2013, the School Board closed its disciplinary proceeding and appointed Fernandez "ESE [Exceptional Student Education] Principal of Instruction System-wide." *Id.*

### 3.    The District's Investigation of Ramirez

On May 7, 2012, Goldman told Ramirez that she was also under investigation for her involvement in the conversion exploration. *Id.* ¶ 24. Miranda sent Ramirez a letter notifying her that the School Board was conducting an investigation and alleging that she used school time and resources to conduct "non-school related business." *Id.* The investigation into Ramirez concluded in July, and Ramirez received a letter informing her that based on the investigation, there was

probable cause to establish that she violated several School Board policies (Standards of Ethical Conduct, Code of Ethics, Staff Network and Internet Acceptable Use and Safety, and Staff Electronic Mail) by using School Board email and resources to conduct "non-school business," *i.e.*, using email to communicate with Fernandez, Cristobol, and other staff regarding the conversion. *Id.* ¶¶ 29-30.

A Conference for the Record was held on August 2, 2012, to address Ramirez's alleged violations. *Id.* ¶ 31. The summary of the conference stated that converting Neva King into a charter conversion school "was not a part of Ms. Ramirez's official duties" and "providing information and feedback pertaining to the charter conversion" was not one of her assignments. *Id.* ¶ 32. The summary culminated in the issuance of directives, including that Ramirez "conform to all school board policies, cease and desist from using School Board resources inappropriately, and adhere to the terms and conditions of the administrative placement." *Id.* ¶ 31. The School Board disposed of its disciplinary action against Ramirez on January 8, 2013, by reissuing these directives. *Id.* ¶ 33.

### 4.    The Plaintiffs' Alternative Assignments and Gag Orders

During the pendency of the investigations and disciplinary processes—beginning on May 2, 2012, for Fernandez and Cristobol and May 7, 2012, for Ramirez—each Plaintiff was reassigned from Neva King to remote District offices and given menial tasks to perform. *Id.* ¶¶ 38-42. The Plaintiffs were instructed not to "contact, visit, or engage in any type of communication with staff, parents, or community members from" Neva King. *Id.* ¶ 39. But the individuals the Plaintiffs were not to contact were never identified, which resulted in the Plaintiffs being "closed off from virtually all of the friends, colleagues, parents, business partners, and community members they had known and worked with for a number of years." *Id.* ¶ 43. When the investigations concluded, the gag orders were not lifted. *Id.* ¶ 44. A few weeks later, on July 10, 2012, legal counsel stated in an email to the Plaintiffs that the gag orders had expired and the Plaintiffs were free to speak to

anyone. *Id.* ¶ 45. But in a reply to Fernandez's personal email account, Ana Rasco, Administrative Director of the Office of Professional Standards, instructed Fernandez that he was to adhere to the May 2, 2012, directives, which included the gag orders. *Id.* The District confirmed the gag orders were still in effect on July 19, 2012, during the Conference for the Record. *Id.* ¶ 46. In a letter dated October 26, 2012, to School Board attorney Walter J. Harvey, the Plaintiffs' counsel asked again whether the gag orders had been lifted; he received no response. *Id.* ¶ 47.

### 5.    The School Board's Response to Neva King Inquiries

On May 3, 2012—the day after Fernandez and Cristobol were removed from Neva King— Keyla Martinez, a member of Neva King's EESAC, sent an email to the School Board, in which she stated: "[T]he principal and vice-principal were removed from the school and are being treated like criminals by the Miami-Dade County Public School Board." *Id.* ¶ 50. She further stated that "the PTA requested an emergency meeting and the School Board has denied their entry into the school and [told the parents] that a PTA meeting would be scheduled in the near future. The parents want to know what is going on and what is going to happen with the future of their kids." *Id.*

On May 15, 2012, Tony Peterle, a parent of a Neva King student, appeared before the School Board, informed it about the events at Neva King, and asked it to allow the charter discussion to continue. *Id.* ¶ 51. A few days later, Peterle sent an email to each member of the School Board expressing his concern about the actions of the District administrators regarding the conversion attempt at Neva King. *Id.* ¶ 52. According to the Plaintiffs, Peterle expressed that "high ranking school officials stationed at the school spread misinformation against the conversion and presented opposing viewpoints from being discussed." *Id.* He also stated that at the sole parent information meeting called during the conversion attempt, only District personnel were permitted to speak. *Id.* He ultimately asked the School Board to prevent District officials from further interfering with the conversion process. *Id.*

On June 18, 2012, Peterle met with Dr. Marta Perez, a member of the School Board, and Walter Harvey, the School Board's attorney. *Id.* ¶ 53. During this meeting, Dr. Perez "admitted that the actions of the District administrators were against the law and another example of the District's 'anti-charter bias.'" *Id.* The School Board, however, took no action. *Id.* ¶ 54.

### 6.   The School Board's History of Opposition to Conversion Charter Schools

The Plaintiffs allege that the "moving force behind the School Board's response (or lack thereof)" to the Neva King conversion attempt is the School Board's "unwritten, long standing, and widespread custom against the creation of conversion charter schools." *Id.* ¶ 57. They contend that the Neva King events are "part of a pattern of conduct to prevent the establishment of conversion charter schools within Miami-Dade County" and that "[s]chool officials will take any measure, including violating civil rights, to support the custom in place." *Id.*

There are currently no conversion charter schools in Miami-Dade County. *Id.* ¶ 58. In 2001, Snapper Creek Elementary was the first district school in Miami-Dade County to submit an application to convert to charter status. *Id.* ¶ 59. At a November 14, 2001, meeting, the School Board discussed the merits of this conversion; School Board members stated "there will be no conversions," "conversions should only be for inner-city schools," "conversions should only occur in D and F rated schools," and allowing a conversion charter school was "opening a can of worms." *Id.* ¶¶ 60-61. The School Board then denied Snapper Creek Elementary's application to become a charter school. *Id.* ¶ 62. The school appealed the denial, the Governor's cabinet remanded the denial to the School Board for reconsideration, and the School Board again denied the application. *Id.*

On January 8, 2013, two parents with children enrolled at Key Biscayne K-8 Center, a Miami-Dade County public school, sent an email to the school's principal requesting her to facilitate a vote to convert the school into a conversion charter school. *Id.* ¶ 63. In response, the District

sent a letter stating that the school principal had not authorized the use of her name in connection with the conversion effort, and that District officials, rather than the principal, would schedule the vote. *Id.* ¶ 64. District officials then dominated the conversion effort at that school, disseminating flyers regarding the prospective conversion that "presented misleading and incorrect information about funding, employee benefits, and available resources if the school converted to a charter school." *Id.* ¶ 65. At a parent information session convened to discuss the conversion, District officials again dominated the question-and-answer session, and proponents of the conversion were not permitted to speak. *Id.* ¶ 66. The District then conducted a teacher and parent vote, and both groups voted not to convert. *Id.* ¶ 67.

Finally, in May 2012, after the Plaintiffs were removed from Neva King, Miami-Dade County School District Superintendent Alberto Carvalho made an unannounced visit to Neva King. Carvalho said in the presence of office staff, "[T]his school is a Miami-Dade County Public School and it is going to remain a Miami-Dade County Public [S]chool and anybody who wants to change that will have to go through me." *Id.* ¶ 68.

### B.   *Procedural History*

#### 1.   **Unlawful Reprisal Proceedings**

During the course of the District's investigation of the Plaintiffs, Marian Lambeth, Chief of the Office of Professional Practices Services, informed the Plaintiffs that "the investigation could lead to disciplinary action against [their] educators' certificate[s], up to and including permanent revocation." First Am. Compl. ¶ 43.[1] On December 18, 2013, the Commissioner of Edu-

---

[1]   The Plaintiffs appear to have removed from the Second Amended Complaint allegations that appeared in the First Amended Complaint regarding the complaints for unlawful reprisal they filed with the Florida Department of Education and the proceedings that followed. *See* First Am. Compl. ¶¶ 29, 43-45.

"In general, [courts] do not consider anything beyond the face of the complaint and documents attached thereto when analyzing a motion to dismiss under Rule 12(b)(6)." *Fuller v. SunTrust Banks, Inc.*, 744 F.3d 685, 695 (11th Cir. 2014) (citation and internal quotation marks omitted). Specifically in this instance, "[a]n amended pleading supersedes the former pleading; the original pleading is abandoned by the amendment and is no longer a part of the

cation reviewed the Office of Professional Practices Services' investigative findings and determined there was no probable cause to pursue any disciplinary action against any of the Plaintiffs' Florida Educator's Certificates. *Id.*

Also during the investigation, on July 13, 2012, each Plaintiff filed a complaint for unlawful reprisal pursuant to Fla. Stat. § 1002.33(4) with the Florida Department of Education (the "Department"). *Id.* ¶ 29. These complaints triggered an investigation by the Department's Office of Inspector General. *Id.* On April 12, 2013, the Department terminated its investigation with a "finding that reasonable grounds exist to believe that an unlawful reprisal has occurred, is occurring, or is to be taken." *Id.* ¶ 44. The Commissioner of Education informed Superintendent Carvalho that the Plaintiffs' complaints would be forwarded to the Division of Administrative

---

pleader's averments against his adversary." *Pintando v. Miami-Dade Hous. Agency*, 501 F.3d 1241, 1243 (11th Cir. 2007). Although courts, under certain conditions, may consider outside evidence, such as complaints filed in *other* federal court actions, *see Fuller*, 744 F.3d at 695, "the weight of federal authority suggests that *previous* complaints [filed in the *same action*] do not generally fall within those exceptions: 'It is well-established that . . . facts not incorporated into the amended pleading . . . cannot be considered by the court on a motion to dismiss the amended complaint,'" *Santana v. Cal. Dep't of Corr. & Rehab.*, No. 09-3226, 2010 WL 4176364, at *7 (N.D. Cal. Oct. 19, 2010) (emphasis added) (quoting *Kelley v. Crosfield Catalysts*, 135 F.3d 1202, 1204-05 (7th Cir. 1998)).

That said, the rule governing amended pleadings superseding former pleadings is a "general" one. *Pintando*, 501 F.3d at 1243. The Court looks to several decisions from courts in the Second Circuit, which have held that courts "[i]n rare circumstances . . . will consider prior pleadings . . . when the plaintiff directly contradicts the facts set forth in his original complaint." *2002 Lawrence R. Buchalter Alaska Trust v. Phila. Fin. Life Assur. Co.*, 96 F. Supp. 3d 182, 206 (S.D.N.Y. 2015). In *Colliton v. Cravath, Swaine & Moore, LLP*, for example, the court accepted the facts as alleged in the plaintiff's original complaint as true for the purposes of a motion to dismiss where the plaintiff made a "transparent attempt . . . to amend his pleading[s] in order to avoid a dispositive defense" raised by the defendant and the amended complaint directly contradicted the original complaint. No. 08-0400, 2008 WL 4386764, at *6 (S.D.N.Y. Sept. 24, 2008), *aff'd*, 356 F. App'x 535 (2d Cir. 2009) (per curiam). In these "rare occasion[s]," a court may "disregard the contradictory and manipulated allegations of an amended pleading." *Barris v. Hamilton*, No. 96-9541, 1999 WL 311813, at *2 (S.D.N.Y. May 17, 1999).

Here, the Plaintiffs' Complaint (Compl. ¶¶ 29, 43-45) and First Amended Complaint (First Am. Compl. ¶¶ 29, 43-45) contain allegations regarding the unlawful reprisal proceedings before the Florida Department of Education. In response to both versions of the complaint, the School Board moved to dismiss, arguing (in part) that the Plaintiffs' claims were barred by the doctrines of res judicata and collateral estoppel, based on the unlawful reprisal proceedings. The Second Amended Complaint inexplicably removes all allegations regarding the unlawful reprisal proceedings—allegations that are, of course, integral the School Board's argument that the Plaintiffs' claims are barred by res judicata and collateral estoppel. As in *Colliton*, this Court finds that the removal of those allegations is a similarly transparent attempt to amend the complaint, in this circumstance, to avoid the res judicata and collateral estoppel defenses raised by the School Board. And while the allegations in the Second Amended Complaint do not explicitly *contradict* the allegations in the prior versions—given that the references to the unlawful reprisal proceedings have simply been removed—the Court has found no Eleventh Circuit authority that would bar the invocation of this exception under these specific circumstances—where plaintiffs have manipulated the allegations in their pleadings to avoid a dispositive defense. Therefore, the Court will recite the pertinent facts here as they previously appeared.

Hearings (the "DOAH"), which would conduct a formal hearing. *Id.*

The DOAH's final administrative hearing took place in January and February 2014. At its conclusion, the administrative law judge entered a recommended order finding that the District committed an unlawful reprisal against each Plaintiff in violation of Fla. Stat. § 1002.33(4). *Id.* ¶ 45. The Department of Education adopted the recommended order entirely, finding that the "Miami-Dade County School Board violated section 1002.33(4)(a)" with respect to each Plaintiff. *Id.* Fernandez was awarded out-of-pocket expenses and lost bonuses totaling over $10,000, but neither Cristobol nor Ramirez were awarded monetary relief. *Id.* The Plaintiffs were awarded costs and attorneys' fees, and the administrative action was remanded to DOAH for a hearing on these issues. *Id.*; *see also generally* Def.'s Mot. Ex. A (the Department's "Final Order").

### 2.      Proceedings in this Court

The Plaintiffs filed a complaint in this Court on May 20, 2015 [ECF No. 1], and amended that complaint on July 9, 2015 [ECF No. 11]. In their First Amended Complaint, the Plaintiffs brought a single claim for violation of their First Amendment rights under 42 U.S.C. § 1983, alleging that the School Board infringed on their freedoms of speech and association and subjected them to adverse employment actions. The School Board filed a motion to dismiss on July 22, 2015, arguing, *inter alia*, that the Plaintiffs failed to state a claim for liability under the strictures of *Monell v. Department of Social Services*, 436 U.S. 678 (1978) [ECF No. 14]. On December 29, 2015, the Court granted the School Board's motion and dismissed the First Amended Complaint without prejudice, concluding that the Plaintiffs' allegations did not meet the requirements of *Monell*, because they "read as an attempt to hold the School Board liable for the actions of District employees and officials in unlawfully retaliating against them for attempting to convert a public school into a charter school." *Fernandez v. Sch. Bd.*, No. 15-21915, 2015 WL 9474616, at *4 (S.D. Fla. Dec. 29, 2015).

Plaintiffs filed their Second Amended Complaint on January 25, 2016 [ECF No. 31]. In response, the School Board has again moved to dismiss. The School Board, as it did before, raises four arguments: (1) this action is barred by res judicata; (2) this action is barred by collateral estoppel; (3) the Plaintiffs fail to state a Section 1983 claim for municipal liability against the School Board; and (4) the Plaintiffs fail to state a claim for a violation of their First Amendment rights. The Plaintiffs oppose the motion.

## II.       LEGAL STANDARD

To survive a motion to dismiss, a claim "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" meaning that it must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the conduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a court must accept well-pleaded factual allegations as true, "conclusory allegations . . . are not entitled to an assumption of truth—legal conclusions must be supported by factual allegations." *Randall v. Scott*, 610 F.3d 701, 709-10 (11th Cir. 2010). "[T]he pleadings are construed broadly," *Levine v. World Fin. Network Nat'l Bank*, 437 F.3d 1118, 1120 (11th Cir. 2006), and the allegations in the complaint are viewed in the light most favorable to the plaintiff, *Bishop v. Ross Earle & Bonan, P.A.*, 817 F.3d 1268, 1270 (11th Cir. 2016). At bottom, the question is not whether the claimant "will ultimately prevail . . . but whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011).

## III.      DISCUSSION

### A.       *Res Judicata*

The School Board first argues that the doctrine of res judicata applies to bar the Plaintiffs' claims. It contends that the Plaintiffs are attempting to relitigate the claims of retaliation that were already decided on the merits by the DOAH in the unlawful reprisal action.

11

The doctrine of res judicata (or claim preclusion) "prohibits successive litigation of the very same claim by the same parties." *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2305 (2016) (citation and internal quotation marks omitted). This prohibition bars "the parties or their privies from relitigating issues that were or could have been raised" in an action that resulted in a final judgment on the merits. *Allen v. McCurry*, 449 U.S. 90, 94 (1980). In the Eleventh Circuit, a party seeking to invoke this doctrine bears the burden to establish its propriety by satisfying four initial elements: "(1) the prior decision must have been rendered by a court of competent juris-diction; (2) there must have been a final judgment on the merits; (3) both cases must involve the same parties or their privies; and (4) both cases must involve the same causes of action." *Kaiser Aerospace & Elecs. Corp. v. Teledyne Indus., Inc.* (*In re Piper Aircraft Corp.*), 244 F.3d 1289, 1296 (11th Cir. 2001). If the party raising res judicata satisfies these elements, the court next determines whether the claim in the new suit was or could have been raised in the prior action; if yes, res judicata applies. *Id.*

That said, "[i]f even one of these elements is missing, res judicata is inapplicable." *Id.*  The Court, therefore, need not undergo an analysis of every element, because it agrees with the Plain-tiffs that they did not raise their Section 1983 claim alleging civil damages in the unlawful reprisal proceeding, nor could they have. "Administrative agencies are creatures of statute and have only such powers as statutes confer." *State ex rel. Greenberg v. Fla. State Bd. of Dentistry*, 297 So. 2d 628, 634 (Fla. 1st DCA 1974). The statute governing unlawful reprisal, Fla. Stat. § 1002.33, pro-vides, first, that "[n]o district school board . . . shall take unlawful reprisal against another district school board employee because that employee is either directly or indirectly involved with an application to establish a charter school." Fla. Stat. § 1002.33(4)(a). Should such an unlawful reprisal be alleged to have occurred (including disciplinary or corrective action, adverse transfer or reassignment, suspension, demotion, dismissal, reduction in pay or benefits, etc.), the statute

directs that an employee file a complaint with the Department of Education. *Id.* If the Department determines that the complaint demonstrates reasonable cause to suspect that an unlawful reprisal has occurred, it conducts an investigation. *Id.* If, after that investigation, the Department determines that reasonable grounds exist to believe that an unlawful reprisal has occurred, it transfers the case to the DOAH to hear the complaint and make findings of fact and conclusions of law for a final decision by the Department. *Id.*

> The DOAH has self-described its power (and the limits of its power) thusly:

> DOAH has no authority to impose a civil penalty in an administrative proceeding . . . . DOAH is an administrative agency organized within the executive branch of state government. DOAH carries out quasi-judicial duties to resolve a factual dispute between a sister, administrative agency and a substantially affected party. The performance of quasi-judicial duties by DOAH does not transform DOAH into a court with the exclusive constitutional power to conduct civil actions. Nor does the performance of quasi-judicial duties imbue DOAH with the authority of a presiding court in a civil action to impose civil penalties.

*Fla. Elec. Comm'n v. Davis*, No. 08-6413, 2009 WL 2009215, at *1 (Fla. Div. Admin. Hrgs. July 9, 2009), *aff'd*, 44 So. 3d 1211 (Fla. 1st DCA 2010). Under the Florida Constitution, only the Florida Legislature can confer on executive branch entities the power to levy civil penalties. *See* Fla. Const. art. I § 18 ("No administrative agency, except the Department of Military Affairs in an appropriately convened court-martial action as provided by law, shall impose a sentence of imprisonment, nor shall it impose any other penalty except as provided by law."). The Florida Legislature ***has not*** conferred upon the DOAH such a power in presiding over unlawful reprisal proceedings. Therefore, the School Board's suggestion that the Plaintiffs could have raised their civil free speech claim and request for civil penalties and damages before the DOAH because the ALJ's adjudication of the Plaintiff's claims was "essentially civil in nature," Def.'s Reply at 9, "is constitutionally infirm." *Davis*, 2009 WL 2009215, at *1.

> Because the DOAH does not possess the power to preside over civil actions, the Plaintiffs'

Section 1983 claims necessarily could not have been raised in the unlawful reprisal proceeding. Res judicata, therefore, does not attach, and the motion to dismiss on this ground is denied.

### B.    *Collateral Estoppel*

The School Board also contends that the Plaintiffs are collaterally estopped from asserting a claim alleging unlawful retaliation based on the fact that the claim was litigated and decided in the unlawful reprisal proceeding. The Court disagrees.

Collateral estoppel (otherwise known as issue preclusion) "serves to bar relitigation of identical issues that have already been fully and fairly litigated." *United States v. Robinson*, No. 12-20319, 2012 WL 3984786, at *5 (S.D. Fla. Sept. 11, 2012) (citing *Quinn v. Monroe County*, 330 F.3d 1320, 1328 (11th Cir. 2003)). On this issue, *Robinson*, relied upon by the Plaintiffs, is instructive. There, the United States government filed a case in this District against the defendant physician for civil penalties for violations of the Controlled Substances Act, 21 U.S.C. §§ 801-904. The government had previously instituted administrative proceedings before the DEA to revoke the defendant's DEA registration, claiming that he violated recordkeeping requirements of the Act. After an administrative hearing, the ALJ issued a decision that recommended against revoking the registration but rather that it be maintained on a conditional basis. The defendant moved to dismiss the civil suit, arguing that it was barred by res judicata because of the previous administrative proceeding. Judge Moreno denied the motion, finding that the Controlled Substances Act provides that while a revocation of a physician's DEA registration is adjudicated in an administrative proceeding, district courts have original jurisdiction over claims for civil penalties for violations of the Act. *Id.* *5 (citing 21 U.S.C. §§ 824(c), 842(c)(1); 28 U.S.C. § 1355). Because the civil penalties claims could not have been brought before the ALJ, res judicata did not bar the claims raised in the complaint. *Id.* As to collateral estoppel, Judge Moreno stated:

> [b]ecause the Court has already found that the claims in this case could not be

> adjudicated in the administrative proceedings regarding [the defendant]'s registra-
> tion, issue preclusion would only apply to bar the re-litigation of factual issues
> already determined by the ALJ . . . [which] supports the factual allegations that give
> rise to this complaint . . . [and] would only serve to satisfy the Government's burden
> in this case.

*Id.* at *6.

This Court sees no reason to depart from the reasoned analysis in *Robinson*. The Court has just determined that the Section 1983 claim at issue in this case could not be adjudicated before the DOAH and res judicata did not attach. If collateral estoppel applied at all, it would apply only to the relitigation of the factual issues that were determined by the ALJ and adopted by the Department—namely, that the School Board committed an unlawful reprisal against the Plaintiffs. This would serve only to support the Plaintiffs' position that the School Board violated their First Amendment rights. Accordingly, the motion to dismiss on the basis of collateral estoppel is denied.

### C.   *Municipal Liability*

Next, the School Board argues that the Plaintiffs have again failed to state a claim against it for municipal liability under Section 1983. The Court provided the operative legal framework in its decision on the School Board's first motion to dismiss:

> A school board's liability under Section 1983 may not be based on the doctrine of
> respondeat superior. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). A
> county is "liable under section 1983 only for acts for which [the school board] is
> actually responsible." *Marsh v. Butler County*, 268 F.3d 1014, 1027 (11th Cir. 2001)
> (en banc). A school board is liable only when the school board's "official policy"
> causes a constitutional violation. *Monell*, 436 U.S. at 694. Thus, to state a Section
> 1983 claim against a school board, a plaintiff must "identify a municipal 'policy'
> or 'custom' that caused [his] injury." *Gold v. City of Miami*, 151 F.3d 1346, 1350
> (11th Cir. 1998) (citations and internal quotations omitted).

> The Plaintiffs here, therefore, have two methods by which to establish the school
> board's policy: "identify either (1) an officially promulgated [school board] policy
> or (2) an unofficial custom or practice of the [school board] shown through the
> repeated acts of a final policy maker for the [school board]." *Grech v. Clayton
> County*, 335 F.3d 1326, 1329 (11th Cir. 2003). Because a school board rarely will
> have an officially adopted policy of permitting a particular constitutional violation,
> most plaintiffs—the Plaintiffs here included—must show that the School Board
> has a custom or practice of permitting the constitutional violation and that the

School Board's custom or practice is "the moving force [behind] the constitutional violation." *Id.* at 1330 (citations and internal quotation marks omitted). The Plaintiffs acknowledge in their opposition that they must proceed via the custom route, as there is no officially adopted School Board policy mandating that employees seeking a charter school conversion be subject to reprisal. *See* Pls.' Opp'n at 6.

"To prove Section 1983 liability based on custom, a plaintiff must establish a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a custom or usage with the force of law.'" *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)) (citation and internal quotation marks omitted). And "[b]ecause Florida law identifies the School Board as the policymaker for the School District, a single decision by the Board may constitute School Board policy, even if not phrased as a formal policy statement." *Brown v. Miami-Dade Cnty. Sch. Dist.*, No. 15-22077, 2015 WL 7450753, at *3 (S.D. Fla. Nov. 24, 2015); *see also Cuesta v. Sch. Bd.*, 285 F.3d 962, 968 (11th Cir. 2002) ("Even in the absence of an express policy or custom, a local government body can be held liable 'for a single act or decision of a municipal official with final policymaking authority in the area of the act or decision.'" (quoting *McMillian v. Johnson*, 88 F.3d 1573, 1577 (11th Cir. 1996))).

Under a ratification theory, the School Board, "by actively endorsing or approving the conduct of its employees or officials, may be held responsible for it." *Garvie v. City of Fort Walton Beach*, 366 F.3d 1186, 1189 (11th Cir. 2004) (citation and internal quotation marks omitted). For the Plaintiffs to state a successful Section 1983 claim against the School Board based on this theory, however, "they must demonstrate that local government policymakers had an opportunity to review the subordinate's decision and agreed with both the decision and the decision's basis." *Id.* (citation and internal quotation marks omitted).

*Fernandez*, 2015 WL 9474616, at *3-4. In their First Amended Complaint, the Plaintiffs' allegations in support of their custom theory appeared only in a single paragraph.

> Unofficial Custom or Practice. The constitutional violations resulted from an unofficial custom or practice of the School Board of Miami-Dade County to prevent the establishment of a conversion charter school as evidenced by the repeated acts and statements of final school board policy makers, including members of the Superintendent's cabinet, to delay, hinder, and prevent Plaintiffs from discussing, considering, and exploring the possibility of a conversion charter school.

First Am. Compl. ¶ 49. The Court found that such a conclusory assertion, unsupported by factual allegations, could not survive *Twombly* and *Iqbal* scrutiny. *Fernandez*, 2015 WL 9474616, at *4. The First Amended Complaint alleged "specific actions taken by the Superintendent's cabinet, other District officials and employees, or 'the District' (in general terms), but it allege[d] no facts

involving actions taken by the actual *School Board* itself, the only entity with final policymaking authority for the purposes of stating a claim for relief under *Monell*." *Id.* (citing *Andrade v. Miami Dade County*, No. 09-23220, 2011 WL 4345665, at *8 ("The mere mention of policy, practice or custom is not enough, for a plaintiff must do something more than simply allege that such an official policy [or custom] exists.")). Furthermore, the Court admonished the Plaintiffs for failing to allege "that the School Board reviewed and ratified the decisions of any of the District officials regarding actions taken against the Plaintiffs *or* that the Board agreed with the decisions and the bases for those decisions." *Id.* (citing *Garvie*, 366 F.3d at 1189).

Considering the ***Second*** Amended Complaint, the Court now concludes that the Plaintiffs have stated a claim for municipal liability under *Monell* sufficient to withstand a motion to dismiss. The Plaintiffs have provided far more than a mere conclusory allegation that a custom existed. Specifically, they allege that the School Board exhibited a bias against charter schools through its actions in blocking the conversion attempts of both Snapper Creek Elementary and Key Biscayne K-8 Center. In the Snapper Creek conversion attempt, for example, members of the School Board stated, *inter alia*, that "there will be no conversions" and that allowing a conversion charter school would be "opening a can of worms." Second Am. Compl. ¶¶ 61-62. The School Board then denied twice Snapper Creek's conversion application. And in the Key Biscayne attempt, the Plaintiffs have provided facts that plausibly suggest the School Board's customary response when a public school attempts to convert, given how closely that situation mirrored the situation at Neva King, down to a question-and-answer session dominated by District officials in which no one in favor of the conversion was permitted to speak.

The School Board forcefully argues that the allegations pertaining to the Snapper Creek conversion could have no bearing on whether a prohibited custom exists. But if the School Board's alleged "anti-charter bias" is as pervasive as the Plaintiffs contend, the fear of reprisal from the

School Board could have chilled any number of potential conversion efforts. The Court will certainly not penalize the Plaintiffs by dismissing their claim simply due to the fact that attempts to convert a public school into a charter school in Miami-Dade County have been exceedingly rare. Consequently, the Court finds that the Plaintiffs have sufficiently alleged that a custom exists.

Even had the Plaintiffs not established the existence of a custom, their allegations pertaining to their own situation state a claim under a ratification theory, as well. *See Garvie*, 366 F.3d at 1189 (holding that a municipal entity, "by actively endorsing or approving the conduct of its employees or officials, may be held responsible for it"). After Fernandez and Cristobol were removed from Neva King, Keyla Martinez of the Neva King EESAC sent an email to the School Board stating that they were "being treated like criminals" by the School Board. Second Am. Compl. ¶ 50. Martinez also claimed that the School Board denied parents entry into Neva King who wished to hold an emergency PTA meeting to discuss the fallout from the removal of the principal and vice-principal from their children's school. *Id.* Even more damning against the School Board are the allegations regarding Tony Peterle, the Neva King parent who appeared personally before the School Board, informed it about the events at Neva King, and asked that it allow the charter discussion to continue. *Id.* ¶ 51. He also emailed the School Board members individually to express his concern about the District administrators' conduct at Neva King. *Id.* ¶ 52. And he met with Dr. Perez, a School Board member, who admitted, in the presence of School Board counsel, "that the actions of the District administrators were against the law." *Id.* ¶ 53. Accepting these well-pleaded allegations as true, the Court is satisfied that the Plaintiffs have plausibly alleged that the School Board actively endorsed or approved the conduct of its employees or officials who punished the Plaintiffs.

The Plaintiffs have met their burden at this stage of the litigation to "demonstrate that local government policymakers had an opportunity to review the subordinate's decision and agreed with

both the decision and the decision's basis." *Garvie*, 366 F.3d at 1189. The factual allegations as to Martinez and Peterle's interactions with the School Board sufficiently demonstrate that the School Board had an opportunity to review what had transpired at Neva King, as well as their administrators and officials' involvement in what had transpired, and agreed with the decision. *See Cuesta*, 285 F.3d at 968 ("Even in the absence of an express policy or custom, a local government body can be held liable 'for a single act or decision of a municipal official with final policymaking authority in the area of the act or decision.'" (quoting *McMillian*, 88 F.3d at 1577)). Accordingly, the motion to dismiss on this ground is denied.

### D.   *First Amendment*

Finally, the School Board argues that the Plaintiffs have failed to state a claim for violations of their free speech rights. "Speech by citizens on matters of public concern lies at the heart of the First Amendment." *Lane v. Franks*, 134 S. Ct. 2369, 2377 (2014). "Government regulation of employees' speech differs from its regulation of the speech of its citizenry," however, because the government, "[a]cting as an employer, . . . is afforded broad discretion in its employment decisions." *Boyce v. Andrew*, 510 F.3d 1333, 1341 (11th Cir. 2007) (per curiam). But "[a] government employer may not demote or discharge a public employee in retaliation for speech protected by the First Amendment," as a public employee "does not 'relinquish the First Amendment rights he would otherwise enjoy as [a citizen] to comment on matters of public interest.'" *Alves v. Bd. of Regents of Univ. Sys.*, 804 F.3d 1149, 1159 (11th Cir. 2015) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)), *cert. denied*, 136 S. Ct. 1838 (2016); *see also Lane*, 134 S. Ct. at 2377 ("[P]ublic employees do not renounce their citizenship when they accept employment, and [the Supreme Court] has cautioned time and again that public employers may not condition employment on the relinquishment of constitutional rights.").

As they are public employees, the Plaintiffs' First Amendment claims are subject to a

four-stage analysis. *Moss v. City of Pembroke Pines*, 782 F.3d 613, 617 (11th Cir. 2015). First, the Court must consider whether their speech was made as a citizen and whether it implicated a matter of public concern. *Id.* If this requirement is satisfied, the Court must weigh the Plaintiffs' First Amendment interests against the School Board's interest in regulating their speech to promote "the efficiency of the public services it performs through its employees." *Id.* at 618 (quoting *Carter v. City of Melbourne*, 731 F.3d 1161, 1168 (11th Cir. 2013)). These two questions are questions of law for the Court to decide. *Id.* If the Court finds that the speech is protected, the analysis proceeds to stage three, which requires the Plaintiffs to show that their speech was a substantial motivating factor in the School Board's adverse employment action. *Id.* And if the Plaintiffs make this showing, the burden shifts to the School Board to prove that it would have reached the same decision even in the absence of the protected speech. *Id.* Because these final two questions, which address the casual link between the Plaintiffs' speech and the alleged adverse employment actions, are questions of fact, a jury must resolve them unless the evidence is undisputed. *Id.*

The School Board's motion to dismiss raises only the first part of the first stage of the analysis—whether the Plaintiffs' speech pertaining to the Neva King inquiry was citizen or employee speech—so the Court restricts its focus accordingly. The Eleventh Circuit just recently described the pertinent analysis as follows:

> The Supreme Court in *Garcetti* [*v. Ceballos*, 547 U.S. 410 (2006)] explained that the line between speaking as a citizen or as a public employee turns on whether the speech "owes its existence to a public employee's professional responsibilities." 547 U.S. at 421-22. If the speech does, then "[r]estricting [it] . . . does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.*; *see also Boyce v. Andrew*, 510 F.3d 1333, 1342-43 (11th Cir. 2007) (collecting cases "[f]ollowing *Garcetti*" in which we interpreted the phrase "owes its existence to"). In *Lane v. Franks*, 134 S. Ct. 2369 (2014), the Supreme Court clarified what it meant in *Garcetti* when it used the phrase "owes its existence to":
>
>> [T]he mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech

> into employee—rather than citizen—speech. The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties . . . .
>
> *Id.* at 2379. We subsequently explained that "[a]fter *Lane*," *Garcetti*'s phrase "owes its existence to . . . must be read narrowly to encompass speech that an employee made **in accordance with or in furtherance of** the ordinary responsibilities of her employment, not merely speech that ***concerns*** the ordinary responsibilities of her employment." *Alves*, 804 F.3d at 1162.

*Carollo v. Boria*, — F.3d —, 2016 WL 4375009, at *4 (11th Cir. Aug. 17, 2016) (emphases added) (footnote omitted). In *Garcetti*, the Supreme Court explained that a court must make a "practical" inquiry to determine whether speech "owes its existence to" an employee's professional duties. 547 U.S. at 424. Practical factors that may be relevant to, but not dispositive of, that inquiry include the employee's job description, whether the speech occurred at the workplace, and whether the speech concerned the subject matter of the employee's job. *Moss*, 718 F.3d at 618.

The Court is unable to undergo such an inquiry at this juncture for several reasons. First, even had the Plaintiffs alleged the content of their respective job descriptions (which they have not), or had the School Board submitted those job descriptions in a form the Court could consider in ruling on a motion to dismiss (which it has not), "[i]t is not appropriate at the motion to dismiss stage for [a court] to interpret" an employee's job description. *Carollo*, 2016 WL 4375009, at *5; *see also Garcetti*, 547 U.S. at 424-25 ("Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform."). Second, because the record has not yet been developed, the Court cannot know whether the speech occurred at the workplace and, regardless, cannot make any inference detrimental to the Plaintiffs or their claims at this stage by assuming that all of the speech took place at Neva King. Third, the Second Amended Complaint does not allege the specific content of the Plaintiffs' speech,[2] which will be necessary for the Court's ultimate determination of that speech's status vis-à-vis the First Amendment. *See Vila v. Padron*, 484

---

[2]   The School Board has advanced no argument as to the sufficiency of the Plaintiffs' factual allegations.

F.3d 1334, 1340 (11th Cir. 2007) ("To determine whether [a] statement receives First Amendment protection . . . we look to the 'content, form, and context of a given statement, as revealed by the whole record.'" (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983))).

And finally, the subject matter of the Plaintiffs' jobs has not yet been defined, so the Court cannot determine whether any speech was made "in accordance with or in furtherance of the ordinary responsibilities of [the Plaintiffs'] employment" or if the speech merely "concerns the ordinary responsibilities of [their] employment." *Alves*, 804 F.3d at 1162. In *Garcetti*, the Supreme Court declined to "articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate" as to what those duties are. 547 U.S. at 424. There is such "room for serious debate" here. Indeed, the Court need look no further for justification of a debate than several statements made by the District's own administrators during the Plaintiffs' disciplinary investigations: (1) Fernandez and Cristobol's Conference for the Record summary stated that "converting Neva King . . . into a charter conversion school *was not a part of* [*their*] *official duties*," Second Am. Compl. ¶ 27 (emphasis added); (2) the letter from Miranda to Ramirez notifying her of the School Board's investigation into her conduct alleged that she used school time and resources to conduct "*non-school related business*," *id.* ¶ 24 (emphasis added); and (3) Ramirez's Conference for the Record summary stated that converting Neva King into a charter school "*was not a part of Ms. Ramirez's official duties*" and "providing information and feedback pertaining to the charter conversion *was not an assignment*," *id.* ¶ 32 (emphases added). A developed factual record that sheds light on the Plaintiffs' "ordinary responsibilities" will be especially important, considering that each of the three Plaintiffs held a different position at Neva King, presumably each with its own unique responsibilities.

The School Board contends that the Plaintiffs' First Amendment claims must fail because "the issue of whether an employee's involvement in activities in furtherance of a school conversion

(during working hours) is part of the employee's duties has been settled in the affirmative by" the Eleventh Circuit's decision in *D'Angelo v. School Board of Polk County*, 497 F.3d 1203 (11th Cir. 2007). Def.'s Reply at 7. In *D'Angelo*, the plaintiff, D'Angelo, was hired as the principal of Kathleen High School, a struggling school in Polk County, Florida. After D'Angelo engaged in a failed attempt to convert Kathleen High to a charter school, the school district elected not to renew his contract, thus ending his employment. D'Angelo filed a complaint in federal court alleging that the Polk County School Board terminated him in retaliation for his exercise of rights protected by the First Amendment. *Id.* at 1206-07. At trial, D'Angelo testified that charter conversion was not "one of [his] assigned duties," but admitted that "[i]t was incumbent upon [him] to investigate Charter and to move towards Charter for the betterment of the students at Kathleen High School." *Id.* at 1206 (alterations in original). He further explained that his "number one duty, and the duty of any principal, [wa]s to do whatever [he could] for the kids." *Id.* (alterations in original). After the close of his case-in-chief, the school board moved for judgment as a matter of law. The district court granted the motion, concluding that, under *Garcetti*, D'Angelo's speech was not protected by the First Amendment.

The Eleventh Circuit affirmed, holding that "D'Angelo's speech on charter conversion is not protected by the First Amendment because he did not speak as a citizen, as required by *Garcetti*." *Id.* at 1210. Important to that conclusion was D'Angelo's admission "that his efforts to convert his school to charter status were to fulfill his professional duties." *Id.* That admission, along with the admission "that he pursued charter conversion to 'explore any and all possibilities to improve the quality of education at'" his school, "which was one of his listed duties and he described as his 'number one duty' in his 'job as a principal,'" sufficed to bring all of his speech relating to the conversion within the scope of his public employment and thus outside the scope of First Amendment protection. *Id.* (citing *Battle v. Bd. of Regents*, 468 F.3d 755, 761 (11th Cir. 2006) (per curiam)

(relying on a plaintiff's admission that "she had a clear employment duty" in ruling that her speech "was made pursuant to her official employment responsibilities")).

Thus, what was dispositive in *D'Angelo* was the fact that D'Angelo ***admitted at trial*** that he pursued charter conversion "pursuant to his [official] duties." *Id.* (quoting *Garcetti*, 547 U.S. at 424). The Eleventh Circuit did not undergo the comprehensive, "practical" inquiry outlined above because D'Angelo's admission obviated the need to do so. Here, by contrast, there is no admission by any of the Plaintiffs that their speech was made pursuant to any "official responsibilities." So *D'Angelo* does not stand for the proposition, as the School Board asserts, that if an employee is involved in charter conversion activities, those activities are necessarily part of that employee's official responsibilities.[3]

The School Board also argues, based on *D'Angelo*, that ***Fernandez specifically***, as the former principal of Neva King, cannot state a First Amendment retaliation claim. In *D'Angelo*, the Eleventh Circuit decided that, under Florida law, D'Angelo undertook his conversion efforts in his capacity as the principal of Kathleen High, not as a citizen, because the statute governing charter conversion provides that "[a]n application for a conversion charter school shall be made by the district school board, ***the principal***, teachers, parents, and/or the school advisory council." *Id.* (emphasis added) (quoting Fla. Stat. § 1002.33(3)(b)). Because there was no evidence that D'Angelo was a parent or a teacher, "his efforts to convert Kathleen High to charter status necessarily were in his capacity as the principal of the school." *Id.* The School Board contends that because the same statutory provision invoked in *D'Angelo* remains in effect today, and because

---

[3] The School Board mentions several times in its briefing that many of the Plaintiffs' actions in furtherance of the conversion effort were undertaken "during working hours" or "during school hours," Defs.' Mot. at 17; Defs.' Reply at 7, as if to argue that the use of school time necessarily renders the Plaintiffs' speech employee speech. It does not. The Eleventh Circuit in *D'Angelo* made clear that "[a]lthough D'Angelo often used school resources and spoke on school premises about charter conversion," the court "d[id] not rely on that fact to conclude that D'Angelo did not speak as a citizen." 497 F.3d at 1211. This Court, therefore, will not hold that the Plaintiffs were not speaking as citizens simply because they researched charter conversion during school hours.

the Second Amended Complaint contains the allegation that Fernandez was the principal of Neva King, not a parent or a teacher, any speech by Fernandez regarding the conversion of Neva King necessarily was made in his capacity as its principal, not as a citizen.

The Court disagrees. The critical distinction between *D'Angelo* and this case, for purposes of this motion, is the posture of the two cases. The Eleventh Circuit in *D'Angelo* was reviewing a decision by the district court granting judgment as a matter of law in favor of the school board at trial after D'Angelo had put on all the evidence in his case-in-chief. And because there was "***no evidence*** that D'Angelo was a parent or a teacher," the court determined that his conversion efforts were necessarily made in the capacity as principal of the school. *Id.* (emphasis added) Here, on review of a motion to dismiss, considering nothing but the allegations contained within the Complaint, this Court cannot and will not be so certain.[4] Moreover, it bears repeating that D'Angelo ***admitted*** that he acted pursuant to his official duties as principal in seeking the charter conversion, and Fernandez has made no such admission here.

\*   \*   \*

Given that this case is in its earliest stages; given that the Court must presently view the allegations in the complaint in the light most favorable to the Plaintiffs, *Bishop*, 817 F.3d at 1270; given that there is "room for serious debate" as to the scope of the Plaintiffs' employment duties, *Garcetti*, 547 U.S. at 424; given that the District and School Board have potentially conflicting interpretations of the scope of the Plaintiffs' duties; given that it is presently unclear to the Court what exactly the Plaintiffs' speech entailed; and given that undergoing *Garcetti*'s practical inquiry into the Plaintiffs' duties would require a much more developed factual record than is presently

---

[4]   The Court notes that (but takes no position on whether) there may be an argument to be made that the unlawful reprisal statute itself signifies the Florida Legislature's intent that speech regarding charter school conversions should be protected. *See* Fla. Stat. § 1002.33(4)(a) ("No district school board, or district school board employee who has control over personnel actions, shall take unlawful reprisal against another district school board employee because that employee is either directly or indirectly involved with an application to establish a charter school.").

before the Court, it would be inappropriate for the Court to conclude at this stage, as a matter of law, that the Plaintiffs did not speak as citizens.

"Discovery will illuminate exactly" what speech the Plaintiffs' engaged in and what their responsibilities were, which will enable the Court to make an informed determination at a later stage of the litigation. *Carollo*, 2016 WL 4375009, at *5. Thus, "with respect to the only question before [the Court] under Rules 8(a) and 12(b)(6)—whether, taking the factual allegations in the complaint as true, the complaint states a claim—[the Court] find[s] it plausible under *Iqbal* and *Twombly*," *id.*, that the Plaintiffs spoke as citizens and not pursuant to, in accordance with, or in furtherance of their ordinary job responsibilities when they engaged in speech regarding the Neva King conversion effort.

Because the School Board's motion raises no other issue for consideration regarding the substance of the Plaintiffs' First Amendment claims, the Court's analysis need not proceed further. Accordingly, the motion to dismiss on this final ground is denied.

## IV.    CONCLUSION

Based on the foregoing, it is **ORDERED AND ADJUDGED** that the School Board's Motion to Dismiss [ECF No. 32] is **DENIED**. The School Board shall **ANSWER** the Second Amended Complaint by **September 9, 2016**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 19th day of August, 2016.

DARRIN P. GAYLES
UNITED STATES DISTRICT JUDGE